**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

---

ENERGY CENTER OMAHA, LLC,

        Plaintiff,

v.

222 S. 15TH STREET, LLC,

        Defendant.

---

CASE NO.

**COMPLAINT AND JURY DEMAND**

Plaintiff, Energy Center Omaha, LLC, for its cause of action against the Defendant, 222 S. 15th Street, LLC, states and alleges as follows:

**INTRODUCTION**

1.    This is an action for declaratory and injunctive relief regarding 222 S. 15th Street, LLC's stated intention to terminate the parties' Steam and Chilled Water Services Agreement executed August 17, 2021 (the "Agreement"), currently in force between 222 S. 15th Street, LLC ("Customer") and Energy Center Omaha, LLC ("Supplier"). The Agreement requires Customer to accept, for a twenty-year term, Supplier's steam and chilled water services to the premises and service address located at 222 South 15th Street, Omaha, Nebraska 68102 (the "Property"). Customer has very recently informed Supplier that the Property was for sale at least as early as January 15, 2024, and the Property is now under contract to a specific buyer. Customer has frivolously tried to excuse its premature termination of the Agreement–seventeen years early–with "uncontrollable events" in a blatant attempt to skirt the seven-figure Early Termination Payment required by the Agreement. Thus, Supplier needs immediate injunctive relief precluding dissipation and/or distribution of the Property sale proceeds to Customer's

1

members or otherwise to prevent irreparable harm.

## PARTIES AND JURISDICTION

2.      Supplier is a limited liability company with all members being citizens of either New York or Delaware. No member is a citizen of the State of Nebraska. Accordingly, for purposes of diversity jurisdiction, Supplier is not a citizen of the State of Nebraska.

3.      Customer is a limited liability company and each of its members is a citizen of the State of Nebraska.

4.      This Court has original jurisdiction over the issues presented in the Complaint pursuant to 28 U.S.C. § 1332. The parties are citizens of different states, and are not citizens of the same state. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000, as the Early Termination Payment owed to Supplier under the Agreement, assuming a termination date of March 1, 2024, is seven figures. Supplier seeks declaratory relief pursuant to 28 U.S.C. § 2201.

5.      Venue in this District is proper under 28 U.S.C. § 1391(b)(1). Customer is the sole defendant and resides in this judicial district.

## BACKGROUND

6.      Supplier is a district energy provider.

7.      District energy providers centralize energy generation, typically produced through a combined heat and power plant or a district heating system, to serve multiple buildings or facilities within a defined area.

8.      Supplier's district energy solution was designed for efficiency and sustainability. It has district energy plants located at 2152 Howard Street and 602 N. 13th Street in Omaha, Nebraska. These plants simultaneously produce chilled water and

steam for heating and/or cooling purposes, maximizing energy utilization, and reducing waste energy.

9.    Supplier's district energy systems offer environmental benefits compared to individual heating and cooling systems in buildings. By centralizing energy generation, its district energy systems can achieve economies of scale and implement cleaner and more efficient technologies, leading to reduced emissions and energy consumption.

10.    For over 50 years, Supplier has provided steam and chilled water services to the central business district of Omaha, serving over 70 customers.

11.    One of these customers is 222 South 15th Street, Omaha, Nebraska (the "Property") which has been connected to the Supplier's systems since it was built on or around 1982.

12.    The current owner of the Property is the Defendant, 222 S. 15th Street, LLC ("Customer").

13.    Based upon earlier statements of Customer, it is Supplier's understanding that 222 S. 15th Street, LLC was created for the sole purpose of owning and operating the commercial leasing space at the Property. Supplier is not aware of the Customer owning any other assets or the company serving any purpose other than to own the Property.

14.    The parties entered into the Steam and Chilled Water Services Agreement executed August 17, 2021 (the "Agreement") for a term of twenty years.

15.    Per the terms of the Agreement, for twenty years, Supplier is obligated to provide services which include the continuous monitoring and maintenance of the chilled water and steam system to ensure reliable and efficient delivery of energy to the

Customer. This includes routine inspections, repairs, and upgrades to the infrastructure as needed.

16.     Energy Service Agreements ("ESA") are a name for the contracts that describe the sale of energy services, like chilled water and steam production.

17.     The Agreement Supplier and Customer entered into is an ESA.

18.     ESAs are often structured to last twenty years or more.

19.     There are several reasons why ESAs have a long commercial term. One reason is because energy-related infrastructure projects, like district energy installations or energy efficiency system upgrades, require substantial upfront investment. Terms over twenty years allow the energy services provider to recoup a portion of their initial investment and earn a reasonable return over the duration of the agreement.

20.     Another reason for the term length of ESAs, including the Agreement between Supplier and Customer, is amortization of costs: By spreading the costs of infrastructure and equipment over a longer period, monthly payments under ESAs can be kept more manageable for customers, including Customer. This facilitates financing and budgeting for both parties involved, including Supplier and Customer.

21.     Energy systems and infrastructure assets represent long-term investments that require careful planning and management to ensure their sustained effectiveness and longevity.

22.     ESAs are designed to provide a suitable timeframe for implementing sophisticated, comprehensive energy solutions, including upgrades and replacements as technology evolves and energy needs change.

23.     District energy infrastructure projects have lifecycle considerations beyond just installation. Maintenance, repairs, and eventual decommissioning need to be factored into the overall project lifecycle. The ESA, including the Agreement between Supplier and Customer, allows for the inclusion of these considerations and ensures that the system remains operational and efficient throughout its intended lifespan.

24.     Additionally, energy policies and regulations can have a significant impact on the economics of energy projects. An ESA provides both parties with a degree of regulatory stability by locking in terms and conditions over an extended period, thus mitigating risks associated with regulatory changes.

25.     From a sustainability perspective, Supplier's Agreement with Customer aligns with articulated sustainability goals, such as reducing greenhouse gas emissions, increasing renewable energy usage, and water conservation. The Agreement provides a framework for achieving and tracking progress toward these goals over an extended period, allowing for more meaningful impact and investment in sustainable energy solutions. Supplier has multi-million-dollar capital expenditure budgets every year to provide Customer with reliability, resiliency, redundancy, and sustainability. For example, the Supplier has currently committed to a $1M water conservation project that will benefit its users, including Customer.

26.     In summary, an ESA is beneficial to customers as it allows the implementation of energy efficient structures without any capital expenditure by the customer. The energy provider, like Supplier here, pays for all project development costs. Once the project is operational, the customer makes service charge payments to the energy supplier.

27.     The industry standard for an ESA is at least twenty years, the precise duration of the Agreement between Supplier and Customer. In fact, some of Supplier's other ESA relationships have written durations of thirty and even forty years. Supplier does not enter into monthly or annual ESA arrangements. Supplier does not have a single customer with an ESA that has an initial term of less than twenty or thirty years.

28.     The twenty-year term of the Agreement strikes a balance between providing a reasonable return on investment for Supplier, ensuring affordability and stability for Customer, and allowing for comprehensive community planning and management of energy infrastructure projects.

29.     Supplier and Customer are each sophisticated parties who engaged in lengthy negotiation over the terms of the Agreement before it was executed, including specifically the duration.

30.     By way of example, and on Customer's behalf, Supplier needed to reserve, purchase, and enter into binding agreements with third parties for capacity, manpower, and fuel procurement based on Customer loads and commitments. All of such third-party obligations depend on the twenty-year duration of the Agreement with Customer.

31.      Supplier also was required to install equipment, and maintain and operate this equipment, based on the long-term commitments it has in place with Customer and other customers, to maintain a high level of reliability and resilience for its systems.

32.     By way of one simple example, Supplier digs up the street and lays pipe, which has a specific cost per main line linear foot, to service the Property and other buildings.

33.     In sum, Supplier's business decisions are made at the outset of relationships like the Agreement, and are continually made by Supplier throughout the duration of the Agreement.

34.     At all points from commencement of the Agreement through the date of this Complaint, Supplier has met its obligations under the Agreement.

35.     On or about January 15, 2024, counsel for Customer sent Supplier a letter indicating its intention to unlawfully terminate the Agreement, citing alleged "uncontrollable events."

36.     Remarkably, one of the "uncontrollable events" cited by Customer was the four-year-old COVID-19 pandemic, and its purported impact on the leasing and purchasing of real estate for general office use. However, the Agreement was signed on August 17, 2021, a point well into the pandemic, during which the shifting dynamics of office space were apparent. To be clear, Customer signed the Agreement more than one year after the genesis of the pandemic, when its worst impact on commercial real estate was accepted and understood by Customer.

37.     The other so-called "uncontrollable event" cited by Customer was the City of Omaha's decision to sell its property to the east of the Property to be the future home of Mutual of Omaha's headquarters in a newly constructed high-rise office building. According to Customer, the new building would theoretically obstruct the Property's view of the park and downtown to the east and hypothetically devalue the Property as an office building.

38.     Mutual of Omaha's development plans were widely known to Customer and the public generally. Numerous articles and references promoting the project date back

to at least 2019, when Mutual of Omaha openly discussed its intentions for further development.

39.     The Agreement does not excuse Customer's contractual obligations regardless of the new construction.

40.     It defies reason that Customer should even suggest that further commercial development, in a commercially zoned area, should nullify the Agreement or any of Customer's separate obligations thereunder, including the Early Termination Payment.

41.     Section 9 Appendix C is the Agreement's force majeure clause.

42.     Neither the four-years-old COVID-19 pandemic, nor the Mutual of Omaha building, qualify as "uncontrollable events." Moreover, Section 9(a) clearly states in the second-to-last sentence: "An uncontrollable event does not include events caused by the negligence or willful misconduct or omission of the party claiming the event, **nor does it include inability to pay**." (emphasis added).

43.     Supplier and Customer, just two months ago, had been in discussions about Customer's future plans with the Property. No mention was made of COVID-19 or the already well-known future Mutual of Omaha development project.

44.     Customer's recent purported concerns about "uncontrollable events" are belied by its recent behavior.

45.     In its purported termination letter, Customer informed Supplier that it has marketed the Property for sale and, as of at least January 15, 2024, the Property is already under contract for sale to a specific buyer.

46.     Once the sale goes through, the new owner of the Property will be Nustyle Development, which is owned and operated by Todd Heistand.

47.     Supplier is familiar with Nustyle Development and its approach to energy procurement.

48.     Despite several opportunities to do so, Nustyle Development has never chosen to connect its buildings to Supplier's services. In fact, in situations where NuStyle has acquired property connected to Supplier's system, it has disconnected Supplier's service from those buildings.

49.     Nustyle Development has communicated its intention to Supplier to convert the Property into a residential building. Nustyle Development, specifically Todd Heistand, has advised Supplier that it will not assume Customer's Agreement or enter into a new ESA with Supplier.

50.     During a phone call with Customer's counsel on Thursday, February 15, counsel indicated that Customer does not intend to honor the Agreement's Early Termination Payment obligations.

51.     Thus, based on Customer's termination letter, citations to alleged "uncontrollable events," and remarks by Customer's counsel, it is clear to Supplier that Customer does not intend to honor the Agreement by paying the agreed-upon Early Termination Payment.

52.     However, Appendix C, Section 9(d) specifically provides that no payment obligation "may be excused or delayed as the result of the uncontrollable event, except as expressly permitted in this Agreement."

53.     The Early Termination Payment section of the Agreement sets forth what Customer owes Supplier in the event of Customer's early termination of the Agreement.

54.     Customer's early termination of the Agreement leaves over seventeen years left in the twenty-year term. Assuming a termination date of March 1, 2024, the Early Termination Payment owed to Supplier is seven figures.

55.     The per year Early Termination Payment is by no means excessive and in fact is extremely conservative. The annual charges paid by Customer over the life of the Agreement have averaged almost twice as much as the yearly Early Termination Payment.

56.     As such, the per year Early Termination Payment is only about half of Supplier's consumption history to service the Property. These anticipated revenues, as well as the capital expenditures, were part of the budgeting that went into Supplier's decision to enter into the twenty-year Agreement with Customer, as Customer knew at the time of entering into the Agreement.

57.     Supplier's General Counsel sent Customer's counsel a letter dated February 1, 2024, objecting to Customer's early termination letter and stating its disagreement with Customer's newly raised "uncontrollable events" excuses in detail.

### FIRST CAUSE OF ACTION
### (Declaratory Judgment)

58.     Supplier incorporates its prior allegations as if set forth here.

59.     There exists a current, ripe and active dispute between the parties regarding whether Customer must pay the Early Termination Payment under the Agreement.

60.     Supplier is a party to the Agreement, whose rights are directly affected by Customer's early termination, and requires a declaration of its rights under the Agreement.

61.     A declaration of Supplier's legal right to an Early Termination Payment

under the Agreement would terminate the uncertainty and controversy caused by Customer's notice of early termination.

62.     Supplier therefore requires, and hereby requests, in accordance with 28 U.S.C. § 2201, that the Court issue an order declaring that Customer's early termination of the Agreement requires Customer to pay Supplier the Early Termination Payment as outlined in the Agreement.

63.     Supplier also requests that the Court issue an order declaring that Customer must pay the Early Termination Payment from the proceeds of the sale of the Property prior to any other disposition of the proceeds, including distributions to its members.

64.     Supplier will suffer irreparable harm if Customer is allowed to terminate the Agreement early without paying the Early Termination Payment. The threat of unrecoverable economic loss qualifies as irreparable harm if the sale proceeds of the Property are distributed to Customer's members prior to payment of the Early Termination Payment.

## SECOND CAUSE OF ACTION
### (Anticipatory Breach of Contract)

65.     Supplier incorporates its prior allegations as if set forth here.

66.     Customer's early termination letter and communications by its counsel makes clear its intention of terminating the Agreement without payment of its Early Termination Payment obligation to Supplier.

67.     Customer's alleged "uncontrollable events" do not fall within the unambiguous definition under Appendix C, Section 9(a) of the Agreement and do not excuse its obligations under the Agreement, including the Early Termination Payment.

68.     At all points from commencement of the Agreement through the date of this

Complaint, Supplier has met its obligations under the Agreement.

69.     If Customer is allowed to terminate the Agreement seventeen years early without meeting its contractual obligation of paying the Early Termination Payment to Supplier, assuming a termination date of March 1, 2024, is easily calculable by the Early Termination Payment provision of the Agreement and Supplier's damages total seven figures.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment)**

70.     Supplier incorporates its prior allegations as if set forth here.

71.     In the alternative, if the Court determines that the Agreement has been terminated by Customer's notice of early termination, then Customer has been unjustly enriched.

72.     As explained in greater detail in the allegations above, anticipated revenues, as well as the capital expenditures, were part of the budgeting that went into Supplier's decision to enter into the twenty-year Agreement with Customer, as Customer knew at the time of entering into the Agreement.

73.     At all points from commencement of the Agreement through the date of this Complaint, Supplier has met its obligations under the Agreement.

74.     It would be inequitable and Customer would be unjustly enriched if it is allowed to terminate the twenty-year Agreement seventeen years early, sell the Property and retain the benefits of the sale by distributing the sale proceeds to its members without paying Supplier the Early Termination Payment.

**FOURTH CAUSE OF ACTION**
**(Declaratory and Injunctive Relief on Voidable Transfers**
**Pursuant to the Nebraska Uniform Voidable Transactions Act ("UVTA"),**
**Neb. Rev. Stat. §§ 36-801 to 36-815)**

75.    Supplier incorporates its prior allegations as if set forth here.

76.    As Customer has terminated the Agreement early, Supplier is a Creditor of Customer because it has the legal and/or equitable right to the Early Termination Payment from it.

77.    In its termination letter, Customer has informed Supplier that it has marketed the Property for sale, and as of at least January 15, 2024, the Property is under contract for sale to a specific buyer.

78.    Based on its excuses of alleged "uncontrollable events" and comments by its counsel, Customer has not or will not dedicate sale proceeds, or any other funds, to pay its contractually obligated Early Termination Payment to Supplier.

79.    If Customer distributes the sale proceeds to its members, upon information and belief, Customer will be either constructively insolvent or actually insolvent within the meaning of Neb. Rev. Stat. § 36-805(a)(2) and Neb. Rev. Stat. § 36-806, respectively.

80.    If allowed to utilize the sale proceeds, including by distributing the same to its members, without payment of the Early Termination Payment to Supplier, Customer will have known that the effect of the transfers would be to hinder, delay, or defraud Supplier within the meaning of Neb. Rev. Stat. § 36-805(a). Such transfers would include, but are not limited to, distributions (including the proceeds of the sale) to the members of the debtor limited liability company.

81.    Any such transfers as alleged in the preceding paragraph would be marked with the "badges of fraud" that assist in determining the actual intent to hinder, delay, or

13

defraud, as those badges are specified in Neb. Rev. Stat. § 36-805(b), which include:

    a.    Such transfers to members would be to insiders of the debtor. Neb. Rev. Stat. § 36-805(b)(1).

    b.    Such transfers would have been concealed to the creditor of the debtor. Neb. Rev. Stat. § 36-805(b)(3).

    c.    Such transfers would have occurred after the debtor was sued or threatened with suit. Neb. Rev. Stat. § 36-805(b)(4).

    d.    Such transfers would have occurred after the debtor removed or concealed assets. Neb. Rev. Stat. § 36-805(b)(7).

    e.    Such transfers would have occurred after the debtor was insolvent. Neb. Rev. Stat. § 36-805(b)(8).

82.    Accordingly, any such transfers are voidable under Nebraska law, and any present or future transfers of like kind will be voidable.

83.    Supplier requests a declaration of this Court that all transfers of Customer's sale proceeds of the Property or other assets without payment to Supplier of the Early Termination Payment, including distributions to members of the debtor limited liability company, are void under Nebraska law.

84.    Supplier further requests a declaration of this Court that any distributions to members of the debtor limited liability company without payment to Supplier of the Early Termination Payment, constitute transfers made with the actual intent to hinder, delay, or defraud creditors of the debtor limited liability company.

85.    An actual, present, and justiciable controversy exists as, upon information and belief, the debtor limited liability company would deny that transfers it has or will make are voidable under the UVTA.

86.    Supplier presently lacks information as to additional recipients of the alleged voidable transfers but will seek leave to amend this Complaint to add them as parties.

87.    Supplier seeks an injunction against Customer prohibiting disposition of the sale proceeds from the sale of the Property or of other assets of the debtor limited liability

company pursuant to Neb. Rev. Stat. § 36-808(a)(3)(i).

WHEREFORE, Supplier respectfully requests that the Court declare and determine that Customer is not excused from its obligations under the Agreement, particularly for payment of the Early Termination Payment to Supplier; that the Court enter a temporary restraining order and preliminary injunction precluding Customer from dissipating and/or distributing sale proceeds from its sale of the Property to its members or otherwise pending the final disposition of this action; for the costs of this action; and, for such further relief as the Court finds just, equitable and appropriate.

**PLAINTIFF REQUESTS A JURY TRIAL IN OMAHA, NEBRASKA.**

Dated this 27th day of February, 2024

ENERGY CENTER OMAHA, LLC, Plaintiff,


By:   /s/ Kenneth W. Hartman
      Steven D. Davidson (#18684)
      Kenneth W. Hartman (#21954)
      Brian Barmettler (#27017)
of   BAIRD HOLM LLP
      1700 Farnam Street
      Suite 1500
      Omaha, NE  68102-2068
      Phone: 402-344-0500
      sdavidson@bairdholm.com
      khartman@bairdholm.com
      bbarmettler@bairdholm.com